RINGGOLD vs. GALLOWAY, *et ux.* Lessee.

APPEAL from *Washington* County Court. Ejectment for *Chew's Farm.* The defendant, (now appellant,) took defence on warrant, and plots were made.

1. At the trial the plaintiff read in evidence a certificate of the survey of *Chew's Farm,* dated the 10th of April 1734, and the patent thereon issued to *Samuel Chew* the 23d of June 1736, for said land, described as "all that tract or parcel of land called *Chew's Farm,* lying in the aforesaid county, *(Prince-George's,)* on that part of *Potomack* river commonly called *Connegocheig* land, and beginning at the end of the fourteenth line of his Lordship's manor, called *Connegocheig Manor,* and running thence," &c. "containing 5000 acres of land more or less, to be held of *Connegocheige Manor.*" And also the certificate of resurvey of *Conococheague Manor,* dated 25th of October 1756, viz. "*Maryland,* set. In obedience to an order from his Excellency *Samuel Ogle,* Esquire, Governor of *Maryland,* to resurvey for his Lordship, the Right Honourable the Lord Proprietary of *Maryland,* his said Lordship's manor of land lying in *Prince-George's* county, called *Connegocheig Manor.* These are therefore humbly to certify, that I have carefully resurveyed the above said tract or manor of land, according to its first intended bounds, and beginning at a bounded," &c. "containing 10,594 acres of land." And proved by competent witnesses that *Samuel Chew,* the patentee of *Chew's Farm,* died seized of said land, leaving *Samuel Chew,* his eldest son and heir at law, who on the death of his father entered and was seized thereof. That *Samuel Chew,* the son, had issue three daughters, *Henrietta Mariam,* married to *Benjamin Gal-*

1814.
DECEMBER.

Ringgold
vs
Galloway

*Where the certificate of survey of a tract of land called C F, made in 1736, stated that the tract to begin at the end of the 14th line of C Manor, and it was proved that the original certificate of survey of C Manor was not recorded in the records of the land office, nor to be found among the papers of that office, parol evidence was admitted to prove that a survey of C Manor was originally made prior to, or cotemporaneous with, the survey of C F, and it was held, that where the 14th line of the survey of C Manor terminates, according to its true location, is the place where C F begins; and whatever is competent and legal evidence to prove the beginning of C F, is legal and competent to prove the termination of the 14th line of C Manor, and so vice versa. In the absence of proof as to the beginning tree and courses of C Manor, (the beginning tree being destroyed or incapable of proof, and the courses lost,) the legal foundation being laid, the next best or secondary evidence may be resorted to, that is, parol evidence of the beginning of C F, calling to begin at the 14th line of C Manor, and by reversing the lines from that point to the place of beginning of C Manor.*

*Where a survey has a tree at the beginning, and all the lines are course and distance, and the tree cannot be proved, the survey may be preserved by the reference of a junior survey to the end of some of the lines, if the place of reference can be proved.*

*The return to a commission for establishing the boundaries of land, issued in 1784, being defective, as appears by the record thereof, it not appearing that legal notice had been given, the plaintiff in ejectment offered in evidence, that the original commission and testimony, reduced to writing by the commissioners, and their return, were duly returned and recorded, and in the margin of the record thereof marked "Exam'd & Delic'd. R D;" that R D attended to the execution of the commission for the persons who obtained it, they residing, and having continued to reside more than 100 miles off, and that they and R D, were all dead; that the original commission, &c. were not to be found, although diligent search had been made amongst the papers of R D. He then offered to prove by two of the commissioners, that the persons examined by them as witnesses were dead; and then offered to prove what such persons declared, when examined in their presence and hearing, and that such declarations were reduced to writing, and returned by said commissioners as the depositions of said witnesses—Held by the county court, that the loss of the commission, &c. was not sufficiently proved to let in parol evidence of the contents of the depositions taken and returned by the commissioners.*

*A paper purporting to be the field notes or courses of the survey of a parcel of land called C C proved to be in the handwriting of J T, who was accustomed to survey lands in the early part of the last century, and who originally surveyed C Manor, was offered as evidence of its ancient running—Held by the county court, that such paper could not be used in evidence for said purpose.*

loway in the year 1775, and Ann, since dead, and Eliza-
beth Crowley, married to Peregrine Fitzhugh; and that
Samuel Chew, the son, so being seized of Chew's Farm,
conveyed to his daughter Henrietta Mariam Galloway, by
deed dated the 10th of December 1782, an undivided third
part of an undivided moiety of the said land. This daugh-
ter, and Benjamin Galloway her husband, are the lessors
of the plaintiff. He further read in evidence the will of
Samuel Chew last mentioned, dated the 24th of Novem-
ber 1785, containing, amongst others, the following de-
vises: "I give and bequeath to my daughter Ann Chew,
all my lands in Washington county, being one third part
of a moiety of a tract of land called Chew's Farm, con-
taining by patent 5000 acres, (the said third being known
as number two in the plot or division which lately took
place by agreement, the other two thirds having been be-
fore given by me by deed to my daughters Henrietta and
Elizabeth, which deeds I hereby ratify and confirm,) toge-
ther with all my interest, which is one third part of the
moiety of those parcels of land which may have been add-
ed by resurvey or otherwise, to said tract of land called
Chew's Farm, to her my said daughter Ann Chew, and
her heirs, for ever, in fee simple. But if my said daugh-
ter Ann Chew shall die before she arrives at the age of
sixteen years, or shall not marry, then in either of those
cases I bequeath and give the real estate devised in this
will to my said daughter Ann, to be equally divided be-
twixt my two daughters Henrietta and Elizabeth, to them
and their heirs, for ever, in fee simple; or if my said daugh-
ter Ann shall die without issue, and not dispose of the said
estate by deed, will, or otherwise, in such case I give and
bequeath it as before to my two daughters, and their heirs,
in fee simple, to be equally divided betwixt them." The
plaintiff then gave in evidence the plots and locations in
the cause; and that all his locations thereon were true.
He then read in evidence the deposition of John Kilty,
Esquire, Register of the Land Office for the Western Shore,
taken by consent, and admitted to be read in evidence, to
prove that the original certificate of survey of Conoco-
cheague Manor, referred to in the certificate and patent of
Chew's Farm, and in the resurvey on the said manor in
October 1736, was not recorded in the records of the land

office, nor to be found among the papers or in the records of that office; and he then offered to prove, by competent witnesses, that an original survey of *Conococheague Manor* was made prior to, or cotemporaneous with, the survey of *Chew's Farm*, and that the end of the 14th line of said original survey of the manor and beginning of *Chew's Farm*, was actually made in the country, when taken up, at the point or place on the plots described by letter black A, according to the plaintiff's location thereof. The defendant objected to the admission of any parol evidence for that purpose. But the Court, [*Buchanan*, Ch. J. and *Shriver*, A. J.] were of opinion that the plaintiff might offer parol evidence to prove that a survey of *Conococheague Manor* was originally made prior to, or cotemporaneously with, the survey and certificate of *Chew's Farm*. The defendant excepted.

2. The plaintiff then offered to read in evidence the record of a commission issued from *Washington* county court, on the 1st of January 1784, at the instance of *Samuel* and *Bennet Chew*, for establishing the boundaries of *Chew's Farm*, and the execution thereof in April 1784, and the testimony of the witnesses therein contained, and reduced to writing by the commissioners, but not signed by the witnesses. This evidence being objected to by the defendant, the court did not permit it to be read, it not appearing that legal notice had been given. The plaintiff then offered in evidence, that the original commission and testimony, reduced to writing by the commissioners, and their return, were returned with the commission to the clerk's office of *Washington* county, and were duly recorded. And offered also to prove, by the present clerk of the said court, that the said original commission, return thereof, and testimony reduced to writing, are not now to be found in his office. And also offered in evidence the following entry in the margin of the records of his office, where the said commission and proceedings were recorded. to wit: "Examined and delivered, *Richard Davis*;" and that such marginal entry was the usual and general practice to denote to whom the originals were delivered. And further proved, that *Samuel Chew* and *Bennet Chew*, the persons at whose instance the said commission issued, lived, at the

1814.

Ringgold
vs
Galloway

time of issuing and executing the same, on the *Eastern* shore of this state, more than 100 miles from *Washington* county, and were not present at the execution thereof; and that *Samuel* and *Bennet Chew* both died on the *Eastern* shore, the first in 1786, and the last in 1793; that they were both old men, and that neither of them ever was in *Washington* county from the day of issuing said commission, until their respective deaths. And further swore and offered a witness to prove, that *Richard Davis*, to whom the original commission and return, and execution thereof, is entered on the record aforesaid to have been delivered, attended to the execution of said commission for said *S. & B. Chew*, and that he died in the year 1788. And also proved by *Samuel Hughes*, jun. a witness sworn for that purpose, and counsel in the case, that he applied to Col. *Rezin Davis*, in his life-time, who was the executor of the said *Richard Davis*, deceased, to search among the papers of his deceased father for said commission and return, who informed the said *Hughes* that he had carefully searched among his father's papers for the same, but it was not to be found; and that the said *Rezin Davis* was summoned for the plaintiff in this cause, to give evidence of that fact, but that he is since dead; and that since the death of the said *Rezin Davis*, the said *Hughes* applied to Mrs. *Eleanor Davis*, his executrix, for permission to search among his papers for said commission and return, who produced to him those bundles and bags of papers which she understood contained the papers of *Richard Davis*, deceased, where the said commission and return might be supposed to be, but after much diligent search the same was not to be found. The plaintiff further offered in evidence to the court, that more than twenty-six years have elapsed since the said original papers were recorded, and twenty years since the death of *Davis*, to whom they were delivered; and offered to prove to the court, by one of the commissioners who was sworn at A, that if the original commission and depositions were here, the matter contained in them would tend to establish the plaintiff's locations at A, and his pretensions. And having thus shown that he was interested to produce said paper, and having as above accounted for the nonproduction of it, the plaintiff produced and swore *Elie Williams* and *Paul Hoye*, the two commissioners

named in said commission, and offered by them to prove to the jury, that the persons examined by them as witnesses were dead. And further offered to prove by them, as the declarations of persons now dead, what they declared at that time in their presence and hearing, and which was by them reduced to writing, and returned by them as their depositions in the commission, as to the end of the fourteenth line of the original survey of *Conococheague Manor*, ending at the point A on the plots, and *Chew's Farm*, beginning at the same place. To this evidence the defendant objected. And the court were of opinion, and so decided, that the loss of the said commission, depositions and return, were not sufficiently proved to let in parol evidence of the contents of the depositions taken and returned by the commissioners, and refused to let such evidence go to the jury. The plaintiff excepted.

3. The plaintiff then, by a competent witness, gave evidence, that a certain *John Flint*, an old man, and many years since dead, was accustomed to survey and run lands in the early part of the last century. That an old man named *Van Swearingen*, was born before the year 1690, and lived on land then vacant, but since forming part of and included in *Conococheague Manor*, at the time said manor was originally surveyed; that said *Van Swearingen* died about fifteen years ago, at the age of 109 years, and from before and at the time of the original survey of said manor, until his death, he had resided on said land and manor. And gave in evidence the declarations of said *Van Swearingen*, often made, that an old man of the name of *John Flint* made the original survey of *Conococheague Manor*; that the said *Flint*, while he was employed in making the survey of said manor, frequented and staid at the house of the said *Van Swearingen*, and made it his home. And further gave in evidence, by a competent witness, the declaration of *Joseph Chapline*, deceased, who died about forty years ago, and was sixty years old when he died, that he *Chapline* said he was employed by *John Flint* as a chain-carrier, and that he acted as chain-carrier on the original survey of *Conococheague Manor*, and that the same was made by *John Flint* as surveyor, and that the money he got as chain-carrier on that survey enabled him to take up the first hundred acres of land he took up. And further read

1814.

Ringgold
vs
Galloway

in evidence the deposition of *Archibald Orme*, aged 79 years and upwards, taken by consent, who proved that he knew *John Flint* in 1752 and 1753, and was taught surveying by him, and that the said *Flint* was at that time an old infirm man; that he was an old surveyor, and had been many years employed in running and surveying lands; and that it was generally known and understood that said *Flint* had been much accustomed to run and survey lands in that part of *Prince-George's* county, now called *Frederick* and *Washington* counties; that the said *Flint* was much employed by wealthy people in old times, and originally run and took up *Carroll's* manor on *Monocacy*, and *Dulany's* lands in *Frederick*, as the deponent generally understood; that it was the general usage and practice, from 40 to 50 years ago, for persons having warrants, to get persons who could survey, to run their lands, and the deputy surveyors of the counties would from the courses so run, make out certificates, and send them to the land office, and have them examined, for patents to issue; and the plaintiff read said deposition, further to prove the hand-writing of said *John Flint*, and thereby proved that the paper annexed is the proper hand-writing of the said *John Flint*, which paper is as follows, viz: "*Conegosheigoe Creek.* Beginning at a bounded blake walnut standing near the mouth of the sd. creek, and the bank of the River *Potawmake*, viz. on ye S E side of ye sd. creek, then for the given line East 200 pr. and continue for 2 or 3 mile, thence from ye sd. bounded tree, down said river S 25 d. E 110 pr." &c. "then up the sd. East side of the side mash, North 27 d. E for 4 mile, or more, according as want to include the improvements, then for the complement to the end of ye East line." This paper was located by the plaintiff on the plots. The plaintiff further offered evidence, that the lessors of the plaintiff had for many years held and claimed *Chew's Farm* up to the line from A, with the parts marked on the plots, Nos. 1 and 2. And he then produced and offered to read said paper to the jury, as the field notes or memoranda in the hand-writing of said *John Flint*, who originally run *Conococheague Manor* as above stated, as evidence of its ancient running, and that the fourteenth line of said original manor ended at or about the letter A on the plots, where he the plaintiff had located the same.

The defendant objected to the said paper being offered in evidence for the purpose aforesaid. And the court sustained the objection. The plaintiff excepted.

4. The plaintiff then swore witnesses to prove, that a certain *Van Swearingen*, about twenty years ago, died in *Washington* county at the age of 109 years, and that the said *Van Swearingen* had lived for sixty years preceding his death on the land now contained within the lines of *Conococheague Manor*, but vacant land when he first lived there; and proved by *Charles Swearingen*, son of said *Van Swearingen*, of the age of seventy-seven years, that he was born there, and has lived all his life at the same place, and he has often heard his father say, that one *John Flint*, an old man, accustomed to run and survey lands, first run and surveyed *Conococheague Manor* and *Chew's Farm;* and that while said *Flint* was engaged in running said manor, he frequented the house of said *Van Swearingen*, and made it his home; and that his deceased father said he was often with *Flint* whilst he was resurveying said manor. And further, that his father, more than fifty years ago, when riding by the place A on the plot, slapping his son, the witness, on the back, and putting his hand on the locust tree at the point A, told him said tree was the beginning of *Chew's Farm;* that he the father was told so by the aforesaid *Flint*, at the time of the aforesaid running, and he has often heard his said father say so, but the witness never heard his father say that he heard this from any other person than the said *Flint*, and never from said *Flint* except at the time aforesaid; that he has often heard his father say, and has always understood, that one line divided *Chew's Farm* from the manor. And further, about 40 years ago his father cut down the tree at the point C on the plot, and often told his son that the said tree was on the line of division between *Chew's Farm* and the manor, and the witness has heard the same from other elderly persons, but who he does not recollect; and he always understood, and has heard, that the stone now planted at C, where the tree was cut down, was planted by Mr. *Ringgold's* father. That the tree, denoted by red A on the plot, was marked by some persons who appeared to be surveying, about fifty years ago, who run near where the witness was working, but who they were, or what land they

were running, the witness does not know, nor under what authority they acted; they said it was a line tree of my Lord's manor. The plaintiff further offered evidence, that the possessions marked on the plot No. 1 and No. 2, were those of the lessors of the plaintiff, claiming *Chew's Farm* more than 25 years ago, and that about twelve years ago they were, by the order of the lessors, excluded as not lying in their lines, and one year afterwards were inclosed by the proprietors of *Conococheague Manor* as part of the same, and had ever since been held by them as such. And that a certain *Joseph Chapline* died about forty years ago, being then of the age of sixty years, and that said *Chapline* in his life-time declared that he was a chain-carrier to old *Flint*, when the said *Flint* was running the original manor of *Conococheague*, and that as chain-carrier he was paid for the same. And produced and read in evidence the deposition of *Orme*; so far as the same contained legal and competent testimony, to prove the usage and custom in taking and making up old surveys, and the character and habits of the said *Flint*. The defendant then offered in evidence the plots and explanations, and gave evidence that the locations on his part were true. He then read in evidence the original certificate of *Butcher's Fancy*, made for *James Butcher*, the 25th of August 1763, "by virtue of an order from his excellency *Horatio Sharpe*, esq. Governor of *Maryland*, and the honourable *Edward Lloyd*, his Lordship's agent of the Province, to lay out for the several persons that shall from time to time apply for any quantity or quantities of land within his Lordship's manor, lying in *Frederick* county, called *Conococheague Manor*," &c. containing 100 acres. And also a lease from the agent of the Proprietary to *James Butcher*, for the above land, dated 25th of August 1763, for 20 years. He further offered in evidence, that shortly after the said lease was made, the said *James Butcher*, under and by virtue of said lease, entered on and possessed the land therein mentioned, as the same is located on the plots, and that the said land had been ever since held and possessed as a part of *Conococheague Manor*, and had been actually and constantly enclosed by fence, for more than 30 years, as a part of *Conococheague Manor*. That the part marked No. 7, with red letters and figures, near A, had been held by actual and constant enclosure, by fence and culture, for more

than 40 years, as a part of *Conococheague Manor.* The defendant then read in evidence the original certificate of survey of *Level Plain*, made the 26th of August 1763, in pursuance of an order of the governor and agent, out of the said manor, containing 200 acres. Also a lease to *George Ross* for the same land, for 21 years, and the patent for the said land to *Thomas Ringgold*, who had purchased the same from the Proprietary agents, dated the 26th of May 1774. He further offered in evidence, the original lease of *Addition to Level Plains*, dated the 29th of September 1765, to *George Ross*, and the patent for the same, dated the 26th of May 1774, to *Thomas Ringgold*, for 170 acres, also a part of the said manor. That the enclosure marked No. 6 on the plots, and included by the red and scratched lines described by red letters, &c. had been held, enclosed and cultivated, as a part of *Conococheague Manor*, for more than 40 years. The plaintiff then prayed the court to direct the jury, that the certificate of the resurvey on *Conococheague Manor*, in October 1736, and the certificate of *Chew's Farm* in 1734, and the patent thereof in 1736, heretofore mentioned, were evidence that a legal survey of *Conococheague Manor* was made prior to, or cotemporaneous with, the original survey of *Chew's Farm*, and that the deposition of *John Kilty* was evidence that such certificate of the said manor was not on record, nor the original papers to be found, and that the plaintiff cannot procure a copy thereof from the said records, and that if the jury believed, from the evidence aforesaid, that *Chew's Farm* did begin at A, as the plaintiff had located it, that then it was evidence that the fourteenth line of the original manor called for, ended at the same place. Upon this prayer the court gave the following opinion: The certificate of resurvey on *Conococheague Manor* in October 1736, and the certificate of *Chew's Farm* in 1734, and the patent thereof in 1736, are evidence to the jury that a survey of *Conococheague Manor* was made prior to, or cotemporaneously with, the original survey of *Chew's Farm* in 1734, and the deposition of *John Kilty* is evidence that no certificate of *Conococheague Manor*, prior to that of October 1736, is on record in the land office; that the original papers are not to be found in that office; and that the plaintiff cannot procure a copy thereof from the said records. And if proof that *Chew's*

*Farm* did originally begin at A, as the plaintiff has located it, it is not evidence that the 14th line of *Conococheague Manor*, as originally surveyed, ended at the same place, yet on the loss of the certificate and courses of that survey of the manor, if the original termination of the 14th line cannot be proved or found, proof of the original survey and location of *Chew's Farm*, from the place marked A on the plots, is evidence from which the jury may find that point to be the beginning of *Chew's Farm*.

If any line of a tract of land is described in the grant to run a certain course and distance to a fixed boundary, if that boundary can be found, the line must be run to it, although in doing so, the course and distance may be varied. But if the boundary called for cannot be found, or the place where it stood ascertained, the course and distance expressed in the patent, (with such allowance for the variation of the compass as a jury, under the circumstances of the case, may make,) must regulate the location of the line. So if a line of one tract of land calls to run a certain course and distance to the beginning, or any other part of another tract, that beginning, &c. must be run to, if it can be found, regardless of the course and distance; but if there is no such land as the tract called for, or the beginning, &c. is lost, so that the call cannot be gratified, the description by course and distance must be obeyed. But in every such case the course and distance must yield to the call if it can be gratified, and can only be resorted to as the next best evidence of the true location of the land, when the place or thing called for cannot be found; and so in this case, which indeed is not that of a line expressed to run a certain course and distance to a fixed boundary, in which the course and distance must govern, if the boundary is lost, but it is the case of one tract of land calling to begin at the end of a certain line of another tract, the termination of which line, if it can be found, must regulate the beginning of the defendant's land, and no proof of any other beginning can be admitted to contradict the record; but if it cannot be found, other evidence may be resorted to, and the beginning, being a point without course or distance to direct or control it, on the loss of the place called for, parol proof of the place from which it was run when originally surveyed, may be received, being the best evidence of the beginning which the

nature of the case will admit of, and not in contradiction of the record.

As to the weight of evidence in this case we are not to be understood as giving any opinion. But where the 14th line of the manor, as originally surveyed ended, and where *Chew's Farm*, as surveyed in 1734 began, are questions to be decided by the jury upon the whole of the evidence before them. The defendant excepted.

5. The defendant then prayed the opinion of the court to the jury, that the jury cannot find that *Chew's Farm* began at the letter A, unless they find that there was a survey of the manor made antecedently to, or cotemporaneously with, *Chew's Farm*, the fourteenth line of which ended at the letter A, and that the evidence aforesaid, offered by the plaintiff, was not sufficient to authorise the jury to find that there was any such survey of the *Conococheague Manor* so made, the fourteenth line of which ended at A, or that the said tract called *Chew's Farm* did begin there. This opinion the court refused to give, and referred to their opinion contained in the next preceding bill of exceptions. The defendant excepted; and the verdict and judgment being against him, he appealed to this court.

The cause was argued on the *first*, *fourth*, and *fifth* bills of exceptions, before CHASE, Ch. J. and NICHOLSON, EARLE, and JOHNSON, J. by

Martin, for the Appellant; and by
Key and Shaaff, for the Appellee.

CHASE, Ch. J. delivered the court's opinion. It is conceded in this case that the original survey of *Conococheague Manor* was prior to, or cotemporaneous with, *Chew's Farm*. and the decision of the court below in that respect is satisfactory and acquiesced in.

It is certain, beyond a doubt, that the place where the 14th line of the survey of *Conococheague Manor* terminates, according to its true location, is the identical place where *Chew's Farm* begins, and whatever is competent and legal evidence to prove the beginning of *Chew's Farm*, is legal and competent evidence to prove the termination of the 14th line of the manor, and so, *vice versa*. If the beginning tree and the courses of the manor could be proved, the

1814.

Mundell
vs
Clerklee

location of the manor from that tree to the end of the 14th line, is the true location, and would be conclusive evidence of the beginning of *Chew's Farm*, at the termination of the said 14th line. In the absence of such proof, the tree, the beginning of the manor, being destroyed or incapable of proof, and the courses lost, the legal foundation being laid, (which has been done by the deposition of *John Kilty*, the late register of the land office,) the next best or secondary evidence may be resorted to, and is legally admissible; that is, proof by parol evidence of the beginning of *Chew's Farm*, or the terminating of the 14th line of the manor, and by reversing the lines from that spot or point to the place of beginning of the manor, the only mode by which it can be ascertained. The admission of this evidence does not preclude the best evidence, the proof of the beginning tree, but is substituted in its place for want of that superior evidence, and no evil or inconvenience results from the admission of such testimony, but the most beneficial effects, for thereby the survey might be preserved and perpetuated. It not unfrequently happens, that where a survey has a tree at the beginning, and all the lines are course and distance, and the tree cannot be proved, that the survey has been preserved by the reference of a junior survey to the end of some of the lines, which place of reference can be proved.

The court concur in the opinions given by the court below in the *first, fourth,* and *fifth* bills of exceptions.

JUDGMENT AFFIRMED.